**ESTATE of W. R. LOVETT, William D. Lovett, Laurence D. Lovett, and Radford D. Lovett, Personal Representatives**

**v.**

**The UNITED STATES.**

**No. 191–74.**

United States Court of Claims.

May 14, 1980.

Sheldon S. Cohen, Washington, D. C., attorney of record, for plaintiff. Lester G. Fant, III, Roger A. Pies and Cohen & Uretz, Washington, D. C., of counsel.

Kevin B. Shea, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and KUNZIG, Judges.

## OPINION

COWEN, Senior Judge.

William R. Lovett[1] (taxpayer) brought suit here in June 1974 seeking a refund of an alleged overpayment of $803,440.25 in federal income taxes and assessed interest for his taxable year 1963. The petition sets forth two different claims involving a variety of issues, but only one question is presented by the taxpayer's motion for summary judgment and the defendant's cross-motion for partial summary judg-

---

1. William R. Lovett died on March 15, 1978. By order of the court dated May 23, 1978, the estate of Mr. Lovett and three personal representatives were substituted as plaintiffs.

ment. That question is whether § 904(d) of the Internal Revenue Code[2] prohibits the inclusion in the taxpayer's gross income in the same taxable year of amounts under both § 551(b) of the foreign personal holding company provisions and § 951(a)(1)(B) of the controlled foreign corporation provisions of the Code. After hearing oral argument and careful consideration of the briefs, we have concluded that § 951(d) does bar such inclusion and we accordingly grant taxpayer's motion for summary judgment.

## I.

A. The facts pertinent to the issue here are few and agreed upon by the parties. During the calendar year 1963, taxpayer owned 100 percent of the sock of Honduras Shipping Company, S. A. (Honduras), a foreign corporation. For 1963 Honduras was both a foreign personal holding company, as defined in § 552, and a controlled foreign corporation, as defined in § 957. Taxpayer was subject to tax in 1963 under § 551(b) on the undistributed foreign personal holding company income of Honduras in the amount of $405,120.09, which amount the taxpayer has paid. Honduras increased its investment in United States property by $305,828 in 1963. As a consequence of this increased investment in United States property, an additional $305,828 was included in taxpayer's gross income pursuant to § 951(a)(1)(B). The resulting increase in federal income tax was assessed and paid in May 1971. A claim for refund was filed on May 26, 1973. Defendant took no action on the claim and the taxpayer filed this suit.

Although the taxpayer raised several grounds in his petition as to why this $305,-828 is not properly includable in his gross income, the only contention advanced here is that such inclusion is prohibited by § 951(d).

B. While the facts of this case are relatively simple, the same cannot, unfortunately, be said of the pertinent Code provisions. Two different groups of Code provisions, or "regimes," are involved here: (1) the for-

eign personal holding company provisions set out in §§ 551–558, and (2) the controlled foreign corporation provisions set out in §§ 951–964 (occasionally referred to herein as subpart F). In broad terms, both regimes, require the United States shareholders of certain foreign corporations to include in their gross income portions of specified types of undistributed income of the foreign corporation. A somewhat more detailed explanation of these two regimes follows.

1. Pursuant to § 552, a foreign corporation is classified as a foreign personal holding company for a taxable year if it satisfies both a gross income requirement and a stock ownership requirement. Subsection (a)(1) of § 552 establishes alternative gross income requirements depending upon whether the corporation has been a foreign personal holding company in a prior year. If the corporation has never before been classified as a foreign personal holding company, then 60 percent or more of its gross income must be foreign personal holding company income. If the corporation has been a foreign personal holding company in some prior year, then only 50 percent or more of its gross income must be foreign personal holding company income to satisfy the gross income requirement. The 50 percent requirement returns to 60 percent upon the fulfillment of either of two conditions: (1) there is a taxable year during which the stock ownership requirement is not met or (2) for 3 consecutive taxable years the foreign corporation's foreign personal holding company income is less than 50 percent of its gross income. Section 553 defines foreign personal holding company income as including, *inter alia*, dividends, interest, gain from the sale of stock or securities (except in the case of dealers), gains from commodities futures transactions, income from estates and trusts, and rents (unless constituting 50 percent or more of the corporation's gross income).

Subsection (a)(2) of § 552 sets out the stock ownership portion of the definition of

2. All section references herein are to the Internal Revenue Code of 1954 as in effect during the relevant time. *See infra* for the text of section 904(d).

a foreign personal holding company. It requires that at some time during the taxable year more than 50 percent in value of the corporation's outstanding stock be owned, directly or indirectly, by not more than five individuals who are citizens or residents of the United States.

If a foreign corporation satisfies these two requirements and is as a consequence classified for a taxable year as a foreign personal holding company, § 551 requires the United States shareholders (as of the last day of the corporation's taxable year on which the stock ownership requirement was met) to include a portion of the corporation's undistributed foreign personal holding company income in their gross income.

2. The provisions of subpart F are much more intricate and involved than those of the foreign personal holding company regime,[3] but not all of the intricacies need be detailed here. A controlled foreign corporation is defined in § 957 as a foreign corporation of which more than 50 percent of the total combined voting power of all classes of voting stock is owned, directly or indirectly, on any day during its taxable year by "United States shareholders." A "United States shareholder" is a shareholder who owns at least 10 percent of the voting stock of the foreign corporation. Section 951(b). If a foreign corporation is a controlled foreign corporation for 30 consecutive days during its taxable year, § 951(a) requires United States shareholders who own stock in the corporation on the last day on which it is a controlled foreign corporation to include certain sums in their gross income.

During the year in issue the following amounts were required to be included in a United States shareholder's gross income by § 951(a): (1) his pro rata share of the corporation's subpart F income, § 951 (a)(1)(A)(i); (2) his pro rata share of the corporation's previously excluded subpart F income withdrawn from investment in less developed countries during the taxable year, § 951(a)(1)(A)(ii); and (3) his pro rata share of the corporation's increase in earnings invested in United States property during the taxable year, § 951(a)(1)(B). Subpart F income, in turn, consisted of income derived from the insurance of United States risks and foreign base company income. Section 952. Foreign base company income included foreign base company sales income, foreign base company services income, and foreign personal holding company income with some modifications. Section 954(a). During the year in issue, the principal modifications to foreign personal holding company income for purposes of including it in gross income under subpart F were that all rents were includable without regard to whether they constituted 50 percent or more of gross income, and that certain foreign personal holding company income derived from the active conduct of a trade or business was not includable. Section 954(c).

3. From even this limited survey of the foreign personal holding company and controlled foreign corporation provisions, it is obvious that there exists some overlapping of their applicability to a foreign corporation[4] and that in some years a corporation could be classified both as a foreign personal holding company and as a controlled foreign corporation. In the absence of some type of coordination scheme, one consequence of such a dual classification would be the double taxation of the same corporate income as foreign personal holding company income under § 551 and as subpart F income under § 951(a). As a means of preventing such double taxation, Congress could have followed one of three paths of

---

3. "In an effort to cover every contingency, the rules of subpart F reach and never leave a lofty plateau of complexity that the Internal Revenue Code had previously obtained only in occasional subsections * * *." B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 17.31 at 17–46 (3d ed. 1971).

4. *See* Tillinghast, *Problems of the Small or Closely Held Corporation Under the Revenue Act of 1962,* 22 N.Y.U. Tax Institute 697 (1964) for a comparison of the coverage of the two sets of provisions.

coordination. It could have taxed the shareholders: (1) as if the corporation were only a foreign personal holding company, i. e., if amounts were includable in gross income under § 551, no amounts would be includable under § 951(a); (2) as if the corporation were only a controlled foreign corporation, i. e., if amounts were includable under § 951(a), no amounts would be includable under § 551; or (3) as if the corporation were both a foreign personal holding company and a controlled foreign corporation, but require amounts to be included in gross income only once, i. e., amounts includable under both §§ 551 and 951(a) would be actually included only under one section or the other. *See Estate of Whitlock v. Commissioner,* 59 T.C. 490, 501–02 (1972), *rev'd* 494 F.2d 1297 (10th Cir. 1974), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 67 *reh'g denied,* 419 U.S. 1041, 95 S.Ct. 529, 42 L.Ed.2d 318 (1974).

The coordination scheme which Congress adopted is set out in § 951(d) which provides as follows:

> **§ 951. Amounts included in gross income of United States shareholders.**
>
> \* \* \* \* \* \*
>
> (d) Coordination with foreign personal holding company provisions.
>
> A United States shareholder who, for his taxable year, is subject to tax under section 551(b) (relating to foreign personal holding company income included in gross income of United States shareholders) on income of a controlled foreign corporation shall not be required to include in gross income, for such taxable year, any amount under subsection (a) with respect to such company.

## II.

Defendant concedes that if the language of § 951(d) is applied literally to the facts of

this case, the taxpayer is not required to include the disputed $305,828 in his gross income.[5] Defendant nevertheless contends that the $305,828 is properly includable in taxpayer's gross income. This contention is based upon Treas.Reg. § 1.951–3 which provides in pertinent part as follows:

> **§ 1.951–3 Coordination of subpart F with foreign personal holding company provisions.**
>
> A United States shareholder (as defined in section 951(b)) who is required under section 551(b) to include in his gross income for his taxable year his share of the undistributed foreign personal holding company income for the taxable year of a foreign personal holding company (as defined in section 552) which for that taxable year is a controlled foreign corporation (as defined in section 957) shall not be required to include in his gross income for his taxable year under section 951(a) and paragraph (a) of § 1.951–1 *any amount attributable to the earnings and profits of such corporation for that taxable year of such corporation.* (Emphasis added.)

The defendant argues that because the $305,828 in increased investment by Honduras in the United States during 1963 is attributable to earnings and profits of Honduras for years prior to 1963, the inclusion of that sum in the taxpayer's gross income under § 951(a)(1)(B) is not barred by Treas. Reg. § 1.951–3. The taxpayer agrees that the inclusion of the $305,828 is not barred by this regulation, but contends that the regulation is invalid, because it is inconsistent with § 951(d). Therefore, since the parties, and the court, agree that the inclusion of the $305,828 in the taxpayer's gross income is prohibited by the bare language of § 951(d), but not by the regulation, the decision here turns on whether Treas.Reg.

---

5. The taxpayer was subject to tax in 1963 under § 551(b) on the undistributed foreign personal holding company income of Honduras in the amount of $405,120.09. Through an assessment by I.R.S., the $305,828 in issue was included in the taxpayer's gross income pursuant to § 951(a)(1)(B) as his share of Honduras' increase in earnings invested in United States

property in 1963. Section 951(d), however, states that a taxpayer who is subject to tax in a particular taxable year under § 551(b) "shall not be required to include in gross income, for such taxable year, *any amount under subsection (a)* with respect to such company." (Emphasis added.)

§ 1.951–3 is a valid interpretation of § 951(d).

■ A. It is horn-book law that Treasury Regulations must be sustained by the courts so long as they "implement the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967), and that they "should not be overruled except for weighty reasons," *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). It is equally true, however, that the power of the Commissioner to promulgate regulations "is not the power to make law," but only the power "to carry into effect the will of Congress as expressed by the statute." *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). In cases where "the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation." *Koshland v. Helvering*, 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268 (1936). And where a regulation "operates to create a rule out of harmony with the statute, [it] is a mere nullity." *Manhattan General Equipment Co.*, 297 U.S. at 134, 56 S.Ct. at 400.

Applying these standards, this court has struck down regulations which were contrary to the intent of Congress as expressed in the statutory language and the legislative history. Conversely, we have upheld Treasury Regulations which were consistent with the Congressional intent. *Compare Philadelphia Electric Co. v. United States*, 127 Ct.Cl. 297, 117 F.Supp. 424 (1954); *Caterpillar Tractor Co. v. United States*, 218 Ct.Cl. ——, 589 F.2d 1040 (1978) *(overturning Treasury Regulations) with Owens-Corning Fiberglas Corp. v. United States*, 199 Ct.Cl. 61, 462 F.2d 1139 (1972); *W & W Fertilizer Corp. v. United States* 208 Ct.Cl. 443, 527 F.2d 621 (1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976) *(upholding Treasury Regulations)*.

The principal prong of the taxpayer's attack on the validity of Treas.Reg. § 1.951–3 is that the regulation limits the § 951(d) exclusion in a manner inconsistent with the plain and unambiguous language of the statute and thereby denies him a benefit granted by the statute. The taxpayer points out that § 951(d) bars the inclusion of "any amount under subsection (a)," while Treas.Reg. § 1.951–3 bars the inclusion only of "any amount attributable to the earnings and profits  *  *  *  · for that taxable year *  *  *.'" Taxpayer contends that there is no justification for such an administrative restriction on the Congressional intent as expressed in the statutory language. Citing our decision in *Lykes Bros. Steamship Co., Inc. v. United States*, 206 Ct.Cl. 354, 513 F.2d 1342 (1975), the taxpayer calls upon us to look to the language of § 951(d) as the best indication of the intent of Congress in enacting the provision.[6]

Defendant readily admits that Treas.Reg. § 1.951–3 permits the taxpayer a narrower exclusion than does the literal language of § 951(d), but asserts that the regulation is perfectly consonant with the overall Congressional purposes in enacting subpart F. Defendant views the legislative history of subpart F as revealing two paramount Congressional aims: (1) to tax as a dividend the repatriation of earnings by foreign corporations through investment in United States property, and (2) to avoid the double taxation of foreign corporate income while achieving the first purpose. According to defendant, the results achieved through the operation of Treas.Reg. § 1.951–3 fulfill both of these purposes, and the regulation is therefore a valid interpretation of § 951(d). Implicit in defendant's argument, and the regulation, is the assumption that Congress adopted the third coordination scheme described *supra*, that is, the shareholders of corporations which are both foreign person-

---

**6.** In *Lykes Bros.*, this court stated:

"The language of the statute itself is the best indication of the legislative intent. Congress often expresses its will in the customary meaning of the language it uses, and when '[t]he requirements of the [statute] are detailed and specific,  *  *  * [they] must be applied with precision.'" (Citations omitted.) [206 Ct.Cl. at 368, 513 F.2d at 1349].

al holding companies and controlled foreign corporations are taxed under both regimes, but taxable amounts need only be included in gross income once.

Not surprisingly, the taxpayer vigorously disputes defendant's view of the legislative history of subpart F. The taxpayer argues that the history shows Congress intended to enact a coordinating provision containing an exclusion of the dimensions prescribed by the literal language of § 951(d). The taxpayer explicitly contends that Congress adopted the first coordination scheme described *supra*, that is, the shareholders of a corporation which is both a foreign personal holding company and a controlled foreign corporation are taxed only under the foreign personal holding company regime. To resolve these conflicting contentions over the Congressional purpose in enacting § 951(d), a somewhat lengthy foray into the legislative history of subpart F is necessary.

B. Subpart F was added to the Internal Revenue Code by the Revenue Act of 1962, Pub.L.87–834, 76 Stat. 960. The legislative history begins with president Kennedy's Tax Message to the Congress of April 20, 1961, in which he proposed widesweeping changes in the taxation of foreign corporations. H.R. Doc. No. 140, 87th Cong., 1st Sess. 6–8, 54, *reprinted in* Committee on Ways and Means, 90th Cong., 1st Sess., 1 Legislative History of H.R. 10650, 87th Cong., the Revenue Act of 1962, Public Law 87–834, 135, 146–48, 194 (1967) [hereinafter cited as Legislative History of H.R. 10650]. In particular, the President called for the elimination of almost all of the tax deferral privileges of certain closely held foreign corporations by taxing to the shareholders the undistributed earnings of such corporations. H.R. Doc. No. 140 at 52–54, 1 Legislative History of H.R. 10650 at 192–94. Later in 1961 the Treasury Department submitted a proposed draft of subpart F to the House Ways and Means Committee. Treasury Department Release D–186, July 28, 1961. Section 952 of this draft addressed the problem of the overlap of the proposed controlled foreign corporation provisions with the existing foreign personal holding company provisions by excluding from the definition of a controlled foreign corporation, any corporation which was also a foreign personal holding company. *Id.* While this draft did not propose to tax the increased investment of controlled foreign corporations in United States property (and contained no provision similar to § 951(a)(1)(B)), *id.*, its coordination scheme was in effect the same as that urged by the taxpayer here.

The controlled foreign corporation provisions of the bill reported by the House Committee on Ways and Means, and passed by the House, H.R. 10650, 87th Cong., 1st Sess., differed in several significant aspects from President Kennedy's proposal and from the Treasury Department draft. The House bill introduced the precursor of § 951(a)(1)(B) in the form of a provision taxing increased investment by a controlled foreign corporation in property which was not necessary to the active conduct of the controlled foreign corporation's trade or business (non-qualified investment). *See* H.R. Rep. No. 1447, 87th Cong., 2d Sess. 63–65 (1962), *reprinted in* 1962–3 C.B. 402, 467–69.

The House bill also changed the method and the scope of the coordination provision of the Treasury draft. Where the Treasury draft had used a definitional approach, the House bill used a computational method. Specifically, the House bill amended § 551(b) of the Code to allow the amount of foreign personal holding company income which would otherwise be included in a shareholder's gross income under that section to be reduced by the amount of foreign personal holding company income included as subpart F income under the new controlled foreign corporation provisions. *See* H.R. Rep. No. 1447 at A 106, 1962–3 C.B. at 604. The House bill did not allow the § 551(b) amount to be reduced by the amount included in gross income as nonqualified investment by the controlled foreign corporation. *See* H.R. 10650, 87th Cong., 1st Sess., § 13(b)(1), 1962, *reprinted in* 1 Legislative History of H.R. 10650, 885, 1021. In other words, under the coordination provision of the House bill, sharehold-

ers could not have been subject to double taxation, but could have been taxed in the same year under both the foreign personal holding company provisions and the predecessor of § 951(a)(1)(B). Thus the coordination scheme of the House bill was similar in its effects to the scheme urged by defendant here.

The Senate Committee on Finance held extensive hearings on the bill passed by the House of Representatives. Among the materials submitted to the Finance Committee during those hearings was a new draft of subpart F prepared by the Treasury Department. This draft reflected amendments proposed by the Secretary of the Treasury to the House bill. *See* 11 Senate Hearings Before the Committee on Finance on the Revenue Act of 1962, 87th Cong., 1st Sess., 4413, 4415 (1962) [hereinafter cited as Senate Hearings]. This second Treasury Department draft replaced the House provision taxing increased investment in nonqualified property with the version of § 951(a)(1)(B) which became law. 11 Senate Hearings at 4422. In addition, the second Treasury draft substituted for the Department's original proposal on coordinating the foreign personal holding company and controlled foreign corporation regimes, a provision essentially identical to that contained in the House bill. 11 Senate Hearings at 4437–38. Hence the second Treasury draft would have coordinated the two regimes by allowing a deduction under § 551(b), and would also have permitted the taxation of shareholders in the same year on both foreign personal holding company income under § 551 and on the corporation's increased investment in United States property under § 951(a)(1)(B).

After its lengthy consideration of H.R. 10650, the Senate Committee on Finance reported a bill which contained § 951(a)(1)(B) in the form proposed by the Treasury, but which made extensive changes in the Treasury supported coordination scheme of the House bill. Specifically, the Senate bill eliminated the § 551(b) deduction passed by the House and favored by the Treasury, and substituted in its place a provision identical to § 951(d). The Fi-

nance Committee report explained the changes made in the House coordinating scheme in the following paragraph:

(d) *Coordination with foreign personal holding company provisions.*—Subsection (d) provides that a United States shareholder who, for a taxable year, is subject to tax under section 551(b) (relating to foreign personal holding company income included in gross income of United States shareholders) on income of a controlled foreign corporation is not required to include in gross income, for such taxable year, any amount under subsection (a) with respect to such company. The corresponding provision of the bill as passed by the House (sec. 13(b)(1)) amended section 551(b) to provide that the amount of undistributed foreign personal holding company income otherwise required under section 551(b) to be included in gross income of a United States person is reduced by his proportionate share of undistributed foreign personal holding company income included in gross income under section 951(a) for the taxable year as his proportionate share of subpart F income of such controlled foreign corporation. [S.Rep.No. 1881, 87th Cong., 2d Sess., 240 (1962), *reprinted in* 1962–3 C.B. 703, 944, U.S.Code Cong. & Admin.News, pp. 3297, 3542].

The Senate version of the coordination scheme was accepted by the Conference Committee and enacted as § 951(d) of the Code, 76 Stat. 1007.

■ C. Upon careful consideration of this legislative history, we have concluded that in enacting § 951(d) the Congress intended to coordinate the foreign personal holding company and controlled foreign corporation regimes in the manner urged here by taxpayer—if a corporation is both a controlled foreign corporation and a foreign personal holding company in a given year, a shareholder is taxed only under the foreign personal holding company provisions. We think the legislative history shows that the Senate realized it was making substantive changes in the coordination scheme of the

House bill—the scheme in effect urged upon us by the defendant—and that the effect of those changes would be to permit shareholders to exclude not only subpart F income already included in the shareholder's gross income as foreign personal holding company income but also to exclude the other amounts taxed under the controlled foreign corporation regime by § 951(a).

The Senate Report demonstrates a clear awareness that the Senate version of the coordination scheme excluded all amounts under "subsection (a)" while the "corresponding provision of the bill as passed by the House" excluded "subpart F income." S.Rep.No. 1881 at 240, 1962-3 C.B. at 944. That the Senate was also aware that "subsection (a)" was not the definitional equivalent of "subpart F income" is revealed both by the detailed discussions in the report of the amounts intended to be included in gross income by those respective phrases and by the explanation in the report of subsection (c) of section 951.

In discussing the amounts taxed by subsection (a) of section 951, the Senate Report distinctly sets out in two indented paragraphs that subsection (a) requires a taxpayer to include in his gross income both:

(1) his pro rata share of the corporation's subpart F income for its taxable year, and his pro rata share of the corporation's previously excluded subpart F income withdrawn from investment in less developed countries for such year; and

(2) his pro rata share of the corporation's increase in earnings invested in United States property for its taxable year which is not excluded from gross income under section 959(a)(2). [S.Rep.No. 1881 at 237, 1962-3 C.B. at 941, U.S.Code Cong. & Admin.News, p. 3540.]

Three pages later, beginning with the paragraph immediately following the discussion of § 951(d), the Senate Report contains an extended explanation of subpart F income. S.Rep.No. 1881 at 240, 1962-3 C.B. at 944. In view of these respective explanations of subsection (a) and subpart F income, it seems most likely that the Finance Committee was aware of the distinctions between the two terms when it used them in explaining the differences between the House coordination scheme and the Senate scheme.

Furthermore, the Senate's cognizance of these distinctions is also exhibited in the explanation in the Senate Report of § 951(c),[7] which coordinates the controlled foreign corporation provisions with the election of a foreign investment company to distribute income. Under the version of § 951(c) as passed by the House of Representatives, shareholders of a foreign investment company which elected to distribute income were not required to include any "subpart F income" in their gross income. *See* H.Rep.No. 1447 at A91, 1962-3 C.B. at 589. The Senate Finance Committee amended the House version of § 951(c) to bar the inclusion of "any amount under subsection (a)." *See* S.Rep.No. 1881 at 240, 1962-3 C.B. at 944. The Senate Report explains this change in § 951(c) as follows:

(c) *Coordination with election of a foreign investment company to distribute income.*—Subsection (c) provides that a United States person who, for his taxable year, is a qualified shareholder, within the meaning of section 12457(c), of a foreign investment company with respect to which an election under section 1247 is in effect is not required to include in gross income under subsection (a) for such year any income of such company. *The corresponding provision of the bill as passed by the House applied only to subpart F income.* (Emphasis in last sentence added)

---

**7.** Section 951(c) provides as follows:

"**§ 951. Amounts included in gross income of United States shareholders.**

\*　　\*　　\*　　\*　　\*　　\*

"**(c) Coordination with election of a foreign investment company to distribute income.**

"A United States shareholder who, for his taxable year, is a qualified shareholder (within

the meaning of section 1247(c)) of a foreign investment company with respect to which an election under section 1247 is in effect shall not be required to include in gross income, for such taxable year, any amount under subsection (a) with respect to such company."

[S.Rep.No. 1881 at 240, 1962–3 C.B. at 944, U.S.Code Cong. & Admin.News, p. 3542].

If in using the term "subsection (a)" in § 951(c), the Senate intended to exclude something more than subpart F income— and we think the last sentence of the quoted excerpt reflects that intention—it is reasonable to conclude that the Senate had the same intent in using the identical term in § 951(d) which is an adjacent subsection having a similar purpose.

In support of its position, defendant relies heavily on the following extracts from the Report of the Senate Finance Committee:

5. *Investment of earnings in U.S. property.*—In addition to the income from insurance of U.S. risks and foreign base company income, U.S. shareholders of controlled foreign corporations also are to be taxed on other earnings of the corporation to the extent of the corporation's investments in U.S. property.

*      *      *      *      *      *

Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that this is substantially the equivalent of a dividend being paid to them. * * *

[S.Rep.No. 1881 at 87–88, 1962–3 C.B. at 793–794, U.S.Code Cong. & Admin.News, p. 3390.]

Defendant's contention that this legislative history reveals a Congressional intent to tax the repatriation of earnings invested in United States property does not persuade us that Congress intended something contrary to the language it employed in § 951(d). We agree that one of the general Congressional purposes in enacting subpart F was the taxation of repatriated earnings. However, it is clear that this general purpose was modified in the specific and detailed statutory scheme which Congress adopted. Subpart F contains a variety of exceptions to, and limitations on, the taxation of repatriated earnings. The most notable of these exceptions are set out in § 956(b)(2) which details several types of United States property in which the earnings of a controlled foreign corporation may be invested, and thus effectively returned to the United States, without being subject to tax under § 951(a)(1)(B). As we recently observed in *Greenville Steel Car Co. v. United States,* 222 Ct.Cl. ——, ——, 615 F.2d 911, 914 (1980).

While a statute should be construed in light of its overall purpose, this court may not substitute its judgment for that of Congress as to the best means of achieving that purpose.

We think this principle is particularly apt here where the legislative history shows that Congress considered alternative coordination schemes and then settled upon § 951(d).

In sum, we think that the legislative history of subpart F shows a Congressional intent that is consistent with the normal understanding of the language of § 951(d) —if a shareholder is subject to tax under § 551(b) in a taxable year on the income of a corporation which is both a foreign personal holding company and a controlled foreign corporation, then he need not include any amounts in gross income under § 951(a)(1)(B) in that year.

C. Defendant's other major argument in support of Treas.Reg. § 1.951–3 is that the limitation imposed by the regulation is necessary to avoid the "absurd" results which flow from a literal application of the language of § 951(d). Defendant cites as an example of such results the following hypothetical:

[A]ssume Honduras, a foreign personal holding company which is also a controlled foreign corporation, had $1,000,000 in accumulated earnings and profits in 1963 and received $100 in taxable income, as adjusted under Section 556(b), in that year. Under Section 951(d), [if literally applied], Honduras could repatriate $1,000,000 by investing in United States property without its shareholder suffering any tax consequences thereby. The sole shareholder of a similarly situated controlled foreign corporation which was not also a foreign personal holding company, on the other hand, would be taxed

under Section 951(a)(1)(B) at least to the extent of $999,900 of the repatriated earnings * * *. [Defendant's initial brief at p. 39.]

We are not certain that defendant's characterization of this result as "absurd" is correct. A Congressional decision to treat dissimilarly situated taxpayers in a dissimilar manner is not absurd simply because it may result in the Treasury receiving less revenue. The point to be made, however, is that invariably the fertile imaginations of tax attorneys—both those representing taxpayers and those representing the Government—are able to generate hypothetical cases in which the Code provision in issue yields apparently anomalous results. As taxpayer's counsel here points out, defendant's regulation can lead to unacceptable results on the facts of this very case. The basic reasoning behind taxing the shareholders of a controlled foreign corporation on the corporate earnings which are invested in United States property is that such investments are in effect indirect dividends which would be taxed if paid directly to the shareholders.[8] Nevertheless, the application of Treas.Reg. § 1.951-3 to the facts here results in taxation of the taxpayer on amounts greater than he would have been taxed upon if Honduras had paid an actual cash dividend to the taxpayer.[9] In light of the dividend equivalence concept of § 951(a)(1)(B), this result would seem even more unacceptable than the result of defendant's hypothetical.

Be that as it may, "[n]either we nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon." *United States v. Calamaro*, 354 U.S. 351, 357, 77

S.Ct. 1138, 1142, 1 L.Ed.2d 1394 (1957). The Internal Revenue Code is the subject of constant oversight and frequent amendment by the Congress, and we think it safe to assume that if unintended results occur in some future case, the problem will be brought to the attention of Congress. Here, however, the results obtained under a literal reading of § 951(d) comport with our understanding of the Congressional intent, while the results obtained under the Commissioner's regulation conflict with that intent.

We are of course aware that in *Estate of Whitlock, supra*, which involved the same issue as this case, the Tenth Circuit reversed the decision of the Tax Court and upheld Treas.Reg. § 1.951-3. However, we are persuaded by the Tax Court's analysis and, to a considerable extent, have adopted that court's reasoning in reaching this decision. Defendant's arguments here have incorporated the *ratio decidendi* of the Tenth Circuit's decision and our reasons for rejecting defendant's arguments explain our disagreement with the Tenth Circuit.

### III.

In conclusion, we are convinced that Treas.Reg. § 1.951-3 is contrary to both the plain meaning of I.R.C. § 951(d) and the Congressional intent. In such circumstances, "we cannot but regard this Treasury Regulation as no more than an attempted addition to the statute of something which is not there. As such the regulation can furnish no sustenance to the statute." *United States v. Calamaro*, 354 U.S. at 359, 77 S.Ct. at 1143. We therefore hold that the taxpayer was not required to include the disputed $305,828 in gross income and is

---

8. S.Rep.No. 1881 at 88, 1962-3 C.B. at 794, U.S.Code Cong. & Admin.News, p. 3391, states in speaking of § 951(a)(1)(B) that: "Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that *this is substantially the equivalent of a dividend being paid to them.*" (emphasis added). *See also* Jenks, *Controlled Foreign Corporations Investment in United States Property: A New Dividend Concept*, 21 Tax L.Rev. 323 (1966).

9. In 1963 the taxpayer included $405,120.09 of Honduras' undistributed foreign personal holding company income in his gross income pursuant to § 551(b). If instead of investing the $305,828 in issue in United States property, Honduras had distributed the same amount to the taxpayer as a dividend, there would have been no further inclusion in the taxpayer's gross income. This is because §§ 556 and 561 would have allowed the taxpayer to deduct the $305,828 dividend in computing undistributed foreign personal holding company income.

entitled to a refund of the overpayment attributable to that inclusion. Accordingly, defendant's motion for partial summary judgment is denied; plaintiffs' motion for summary judgment is granted, and the case is remanded to the trial judge for determination of the amount of recovery.